**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EDWARD MCDONALD, | : | |
| | : | Civil Action No. 15-6231 (JLL) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| WARDEN, NEW JERSEY STATE | : | |
| PRISON, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**LINARES**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Edward McDonald ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1).   Respondents filed a response to the petition (ECF No. 11), to which Petitioner has replied (ECF No. 12).   For the following reasons, this Court will deny the petition for a writ of habeas corpus, and no certificate of appealability shall issue.

## I.  BACKGROUND

In the opinion affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey – Appellate Division provided the following summary of the facts underlying Petitioner's conviction:

> The Armanious family lived in the first-floor apartment of a two-story, two-family house at 85 Oakland Avenue in Jersey City. Hossam [Armanious] worked in a hotel in Princeton and [his wife] Amal worked at the post office.

According to the State's proofs, on January 13, 2005, Amal's brother, sister and parents went to 85 Oakland Avenue and knocked on the door, worried because they had been unable to contact her by telephone.   After receiving no response, at midnight they contacted the police, who returned to the home with them.

With a flashlight, Sergeant Mark Cavanaugh was able to see through a porch window that the contents of a drawer in the front room were strewn around the floor.   He entered the home through the window and, in the dining room observed Amal's lifeless body in a puddle of blood, partially hanging off an upended chair, her arms, legs, and head duct taped.   A bloody kitchen knife was on the living room couch.

Cavanaugh opened the front door for the other officers.   In the bedroom, they found Sylvia [Armanious]'s body lying on the bed, "hands duct taped above her head, hands and feet duct taped, covered in blood."   A large bloody butcher knife was found on the bed next to her body.   They found Monica [Armanious]'s body "crouched in the bathroom with her neck slit, drenched in blood." She was in her pajamas, duct tape across her mouth and eyes.

Hossam's body was in the front bedroom, "arms and legs duct taped, arms behind his back, head duct taped, covered in blood."   Protruding from his left shoulder was a wooden-handled butcher knife.   His pockets had been pulled out.   The apartment showed no sign of forced entry, and both the front and rear doors were locked with a dead-bolt.   Closet doors and drawers were open.

Autopsies later showed that Hossam had a three-and-a-half-inch deep wound on his neck that was fatal.   He also had three facial wounds that were consistent with torture.   Amal had two knife injuries to her throat, one of which injured her trachea, and another that injured one of her main arteries and one of her main veins.   Her right jugular vein and carotid artery had been cut.

Sylvia had eleven knife injuries.   Most of the injuries were to her neck area and one stab wound was in her breast.   Her right jugular vein and carotid artery also had been cut.   Monica had a total of nineteen injuries.   Eleven of the knife injuries were inflicted on her neck, chest and face.   She had an additional eight defensive injuries on her arms, wrist and hand.   Both sides of Monica's

jugular vein and the left side of her carotid artery had been cut.   The neck injuries on all the victims "contribut[ed] significantly to their cause of death."

After discovering the bodies, the officers knocked on the locked door of the second-floor apartment.   When they received no response, the police kicked in the door.   Inside they found [Petitioner], his girlfriend, Stephanie Torres, and three young children, who all lived there.   [Petitioner] was "very calm" as the police questioned him and Torres, both of whom said they had not heard or seen anything unusual.   Cavanaugh described [Petitioner]'s demeanor as "just surprisingly not excited about us kicking in his door," never inquiring why the police had kicked in his door in the early morning hours or what had happened downstairs.

[Petitioner] agreed to accompany the police to the Hudson County Prosecutor's Office, where at approximately 6:30 a.m., he gave a formal statement, which was audiotaped.[]   Thereafter, [Petitioner] was transported to a relative's home because he was not permitted to return to the crime scene.

Upon further investigation, the police determined that neither Hossam nor Amal had gone to work on January 12, 2005, and that their daughters had not been to school.   A supermarket receipt found in the Armanious's kitchen trash was dated January 11, 2005, at 7:12 p.m.   A security videotape from the Princeton hotel where Hossam worked showed that he left there at 8:40 p.m. on January 11, 2005.

The police also obtained a January 18, 2005 letter sent to Hossam by the Bank of America that advised him of "unusual activity" with his ATM card between January 14 and 16, 2005. Bank records indicated that Hossam's Bank of America ATM card had been used in transactions or attempted transactions twenty-one times between January 12, 2005, at 8:45 a.m. and March 3, 2005. A total of $2907 had been withdrawn.   A video surveillance photograph at a Bank of America drive-through several blocks from Oakland Avenue showed that the driver of a 1990 Buick LeSabre used Hossam's ATM card on January 12, 2005 at 8:45 a.m.

According to motor vehicle registration records, [Petitioner]'s mother owned a 1990 Buick LeSabre.   Police

3

surveillance photographs of her car showed decals and objects in the front and back windows that appeared to be the same as in the Buick that was used at the ATMs. In addition, the images of the individual seen on the bank transaction videos were consistent with photographs of [Petitioner]. As a result, [Petitioner] was placed under surveillance and wiretaps were placed on his home and cell phones.

On March 3, 2005, at 8:30 a.m., detectives stopped [Petitioner] on the street and he agreed to accompany them for additional questions. [Petitioner] was taken to FBI headquarters in Newark. He was "[v]ery calm and cooperative." At 9:35 a.m., [Petitioner] was read his *Miranda* [*v. Arizona*, 384 U.S. 436 (1966),] rights and agreed to waive them.

[Petitioner] initially was interviewed by Detectives Kenneth Kolich and Jeffrey Marsella. When asked about the ATM transactions, [Petitioner] first said he knew nothing about them. But when confronted with a video photograph that showed his mother's car at the bank drive-throughs, [Petitioner] admitted that he had used Hossam's ATM card. He claimed that, several days prior to the murders, he had intercepted the Armanious's mail and found the card, and that he had a friend who hacked into the bank's computer and obtained the pin number.

However, after being shown additional bank photographs of the car and an individual using the card after the murders, [Petitioner] gave yet another account, telling police that his friend Hamilton Sanchez had given him the card. He further explained that, on Tuesday, January 11, 2005, he had arranged with Sanchez that he would unlock the front door at 7:30 or 8:00 p.m. and return upstairs so that Sanchez could rob the Armanious family; that Sanchez called him later that night and told him where to meet the next morning so Sanchez could give him the pin number; and that [Petitioner]'s job was to withdraw as much money as possible from the ATM[s].

That interview, which was not recorded, continued until 3:00 p.m., when detectives took a formal audio and videotaped statement wherein [Petitioner] reiterated what he had told police that morning. The day of the murders, he went to work and met Sanchez at lunchtime, when Sanchez told [Petitioner] he intended to rob the family that night. As planned, [Petitioner] went home and at 6:00

4

p.m., unlocked the front door, checking it again at 7:30 p.m. Although [Petitioner] did not know the exact time Sanchez entered the apartment, Sanchez called him later that night and they arranged to meet the next morning.   When they met at 8:30 a.m. on January 12, 2005, Sanchez handed [Petitioner] "a card and a pin number" and said "use this."   [Petitioner] was to give the money to Sanchez and keep some.

Because Kolich "was not totally convinced [Petitioner] was telling the truth," he arranged for [Petitioner] to be interviewed by special agent Edward Holloman of the Federal Bureau of Investigation, who "ha[d] a lot of experience interviewing people." That interview lasted a couple of hours and, in accordance with FBI policy, it was not recorded and Holloman took no notes.[1]

[Petitioner] told Holloman that he had assisted Sanchez in robbing the Armanious family because [Petitioner] owed money to a loan shark.   [Petitioner] initially claimed that he left when the robbery "went bad" and Sanchez killed Monica, saying "he didn't want to have anything to do with any killing."

When Holloman expressed disbelief, [Petitioner] eventually admitted killing Monica after she had loosened her blindfold because he was afraid she would recognize him.   He also admitt[ed] killing Hossam by stabbing him in the neck with a knife from the apartment, but denied torturing him.   [Petitioner] also said he had a handgun that was secreted in a dryer in his residence.

Kolich observed Holloman's unrecorded interview of [Petitioner] from another room.   At 8:30 that evening, the detectives took a second videotaped statement from [Petitioner] wherein he said he had arranged to meet Sanchez at the house at 7:30 p.m. on January 11, 2005.   [Petitioner] wore a mask and a hoodie and carried a 9 millimeter gun that he owned.   He brought

---

[1] Although the Appellate Division states that Holloman took no notes, his testimony at the *Miranda* hearing was that he took no notes as to the substance of Petitioner's interview, but that he did take down descriptive and biographical information about Petitioner which was "reduced directly" onto an FBI HD-497 Form.   (*See* Document 44 attached to ECF No. 11 at 29-30). Holloman clarified that "there were no notes taken on my part related to what [Petitioner] said" during the interview.   (*Id.*at 30).   Thus, it is clear that the Appellate Division's statement is accurate in so much as Holloman took no notes regarding the conversation, and recorded only Petitioner's description for his HD-497 report.

duct tape with him.   Sanchez also wore a mask.

When Amal answered the door, [Petitioner] threatened her with the gun.   Then he and Sanchez tied up Amal and the girls and searched the house for money and "everything."   When Hossam came home, they tied him up and put him in the bedroom with the other family members.   Hossam gave them his debit card and its pin number.

[Petitioner] panicked when Monica pulled the blindfold off her face and Sanchez said "that she noticed us and that everybody had to die."   After [Petitioner] put Monica's blindfold back on her, Sanchez "dragged" Monica into the bathroom and told [Petitioner] to kill her.   [Petitioner] killed Monica with a knife from the kitchen and walked back to the living room "in shock."   [Petitioner] never explained why it became necessary to kill Monica given that he and Sanchez wore masks the entire time.

Contradicting his statement to Holloman in which he admitted also killing Hossam, [Petitioner] now told the detectives that Sanchez killed the other three people.   [Petitioner] said he took a small knife from the house and, after the killings, went upstairs to his home and went to bed.   He had "[a] little bit" of blood on his clothes and threw them and the knife into the garbage at his grandmother's house.   He told his girlfriend he had robbed a store. Sanchez kept a hundred dollars that they found in Hossam's pocket and [Petitioner] kept the ATM card.

On March 3, 2005, the police also searched the apartment [Petitioner] had moved into at 18 Charles Street in Jersey City. There, inside the control panel of the clothes dryer, they found a 9 millimeter semi-automatic pistol with one bullet in the chamber, a sock with nine bullets inside, and a black knit cap.   The magazine area of the gun was empty and its serial number was scratched out.

The police found no fingerprints, blood, DNA, hair or other fibers that linked [Petitioner] to the scene.   All of the bloody knives found in the apartment had been part of the family's cutlery.

(Appellate Division Opinion, Document 21 attached to ECF No. 11 at 3-11).

6

Prior to Petitioner's trial, the trial court held a *Miranda* hearing to determine the admissibility of Petitioner's recorded statements on August 6, 7, and 9, 2007.   During the hearing, Detective Kolich testified that, on the morning of March 3, 2005, Petitioner was brought to the FBI Headquarters in Newark, New Jersey, for an interview regarding the deaths of his neighbors. (Document 43 attached to ECF No. 11 at 15).   That morning, several officers approached Petitioner while he was on his way to meet with his probation officer, and asked him to accompany them for an interview, to which Petitioner agreed.   (*Id.* at 15-16).   Upon his arrival at the building, Petitioner was permitted to take a restroom break, and was then interviewed.   (*Id.* at 18).   Prior to any questioning in the initial interview, Petitioner was advised of his *Miranda* rights, using a *Miranda* waiver form.   (*Id.*).   Petitioner stated that he understood his rights, waived them, and then initialed each right on the form and signed the waiver form.   (*Id.* at 18-20).   The Detective described Petitioner's demeanor during the interview as "[c]alm, but somewhat nervous," and stated that Petitioner answered all of the officer's questions without issue.   (*Id.* at 22).   According to the testimony at the hearing, Petitioner provided several statements as recounted in the Appellate Division's opinion quoted above.   (*Id.*).   The Detective stated that, during the interviews, Petitioner was provided with a bathroom break every hour, was given food and water, and that Petitioner never requested a lawyer or to stop the questioning.   (*Id.* at 29-30).

FBI Agent Holloman also testified at the hearing.   (Document 43 attached to ECF No. 11 at 11).   The agent testified that he conducted a polygraph examination of Petitioner in the afternoon of March 3, 2005.   (*Id.*).   The agent testified, that, before Petitioner was tested and re-interviewed by him, Petitioner had his *Miranda* rights re-explained to him, waived those rights,

and consented to the polygraph.   (*Id.* at 11-14).   Agent Holloman then recounted Petitioner's statements to him as summarized above.

Following Agent Holloman's testimony, Detective Kolich continued his testimony, recounting the events leading up to Petitioner's final videotaped statement.   (*Id.* at 51).   The detective testified that, after the polygraph, Petitioner was given another break to use the bathroom, and that the statement was taken after that break.   (*Id.* at 53).   That final statement reflected the facts summarized above.   On cross examination, the detective admitted that he had told Petitioner during the first interview that it was possible that his mother or girlfriend could be arrested or charged based on their participation, if any, in the crime, and that if that happened the courts would have to determine what happened to Petitioner's children.   (Document 45 attached to ECF No. 11 at 10-12).   The detective clarified that he made these statements to explain the way the system worked to Petitioner and to honestly explain to him what might happen to his family members depending on their involvement.   (*Id.* at 12).

On September 12, 2007, the trial court issued an opinion in which it denied the motion to suppress Petitioner's statement.   In denying the motion, the Court noted that while Petitioner only formally waived his *Miranda* rights by signing a waiver form in the morning hours of March 3, 2005, Petitioner was provided with a copy of his waiver of rights form, asked to reread them, and acknowledge his waiver of rights prior to the afternoon interviews.   (Document 4 attached to ECF No. 11 at 7).   Given these facts, the trial court determined that Petitioner had waived his rights in both instances, and that the waiver had been knowing and intelligent.   (*Id.* at 7-9).   The trial court also concluded that, based on the video tapes and reports, it was clear that the officers and agents had not used suspect techniques, that Petitioner had cooperated with them willingly and given his

8

statements knowingly and voluntarily, and that there was no evidence that Petitioner's will had been in any way overborn during questioning.   (*Id.*).   The trial court therefore denied the suppression motion.   (*Id.*).

Petitioner's case then proceeded to trial.   Following an eleven day trial and lengthy jury deliberations,

> the jury convicted [Petitioner] of the felony murder . . . of all four victims based on the burglary of their home armed with a handgun, for which he was also convicted.   [Petitioner] also was convicted of the felony murder based on robbery of Sylvia, Amal, and Hossam, as well as the predicate offense [of robbery as to those victims], but the jury was unable to reach a verdict on those charges as to Monica.

> [Petitioner] was acquitted of purposeful or knowing murder and the lesser-included aggravated and reckless manslaughter charges for Sylvia, Amal, and Hossam.   The jury was unable to reach a verdict on murder or the lesser-included manslaughter charges for Monica.

> With respect to the weapons charges, [Petitioner] was convicted of possession of a handgun without a permit, and possession of a gun for an unlawful purpose with respect to each of the victims, including Monica.   He also was convicted of possession of a knife under inappropriate circumstances.   He was acquitted of possession of a knife for an unlawful purpose with respect to Sylvia, Amal and Hossam, but the jury was unable to reach a verdict on that charge with respect to Monica.

> Finally, [Petitioner] was convicted of attempted theft by deception, theft by deception, and wrongful impersonation.   After the verdict, [Petitioner] waived his right to a jury trial on the charge of certain persons not to have weapons, of which he was subsequently found guilty.

> [Petitioner] was sentenced to four life terms for the felony murder charges and concurrent terms for the other crimes.

(Document 21 attached to ECF No. 11 at 2-3).

Following his conviction, Petitioner appealed.   The Appellate Division affirmed Petitioner's conviction and sentence, finding that Petitioner was not entitled to a mistrial based on a witness's unexpected and brief testimony that Petitioner had previously been in jail for which the trial court gave a curative instruction, that Petitioner was also not entitled to a mistrial based on comments by a witness on cross examination that the only person who could answer questions as to who, other than Sanchez, was with Petitioner during the crime was Petitioner himself which Petitioner alleged amounted to improper comment on his choice not to testify, that Petitioner knowingly and voluntarily waived his *Miranda* rights and that the police did not impermissibly use coercion by informing Petitioner that his family members may be charged with crimes based on their involvement in the offenses at hand, and that Petitioner's consecutive sentences were proper.  (Document 21 attached to ECF No. 11).   Petitioner also filed a petition for certification, which was denied on October 24, 2011.   (Document 24 attached to ECF No. 11).

Petitioner thereafter filed a timely petition for post-conviction relief, which was denied by way of a written order and opinion on October 10, 2013.   (Documents 32-33 attached to ECF No. 11).   Petitioner appealed, and the Appellate Division affirmed the denial of Petitioner's PCR on April 20, 2015.   (Document 38 attached to ECF No. 11).   Petitioner filed another petition for certification, which was denied on July 7, 2015.   (Document 41 attached to ECF No. 11). Petitioner thereafter filed the instant habeas petition on or about August 17, 2015.   (ECF No. 1).

## II.   DISCUSSION

## A.   Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual

11

determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."    28 U.S.C. § 2254(e)(1).

## B.  Analysis

## 1.  Petitioner's ineffective assistance of counsel claims

In his petition, Petitioner first argues that he is entitled to habeas relief because he suffered from ineffective assistance of trial counsel.[2]  The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).   To succeed on an ineffective assistance claim, a petitioner must also

---

[2] The State argues that at least some of the claims Petitioner presents in his petition were not properly exhausted.   Because this Court can and will deny all of Petitioner's claims on the merits, this Court need not dismiss the petition for failure to exhaust.   *See* 28 U.S.C. § 2254(b)(2).   To the extent that Petitioner argues that he is entitled to proceed without exhaustion either because he is allegedly actually innocent or that ineffective assistance of PCR counsel warrants this Court hearing his claims without exhaustion, however, he is incorrect.   Both a gateway actual innocence claim and ineffective assistance of PCR counsel are mechanisms that may under the right circumstances excuse procedural default – a situation which occurs where a state court has declined to hear a claim on the merits due to a failure to abide by state procedural rules; neither mechanism excuses a failure to exhaust.   *See Martinez v. Ryan*, --- U.S. ---, ---, 132 S. Ct. 1309, 1316-19 (2012) (as to ineffectiveness of PCR counsel); *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (as to actual innocence).   In any event, because Petitioner has only alleged, and has not even attempted to show, either actual innocence or ineffective assistance of PCR counsel, neither doctrine would be of aid to him even if his claims were procedurally defaulted rather than unexhausted.   *See Martinez*, 132 S. Ct. at 1316-19; *Schlup*, 513 U.S. at 316, 324.

show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

13

**a. Petitioner's Corroboration claims**

Petitioner first argues that counsel was ineffective in failing to move the trial court to dismiss the indictment because Petitioner's conviction was the result of his own "uncorroborated" confession to the police.   It is a venerable rule of both New Jersey and federal criminal law that "an uncorroborated extrajudicial confession cannot [alone] provide the evidential basis to sustain a conviction."   *State v. Lucas*, 30 N.J. 37, 51, 152 A.2d 50 (1959); *see also Smith v. United States*, 348 U.S. 147, 152 (1954) ("an accused may not be convicted on his own uncorroborated confession").   Under the rule, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."   *State v. Di Frisco*, 118 N.J. 253, 571 A.2d 914, 925 (N.J. 1990) (quoting in full *Smith*, 348 U.S. at 156).   The New Jersey Courts have thus held that "[a]s long as the confession is 'corroborated by other evidence tending to strength it, . . . the [Defendant's guilt] may be proven by the confession itself."   *State v. Abrams*, 607 A.2d 179, 185 (N.J. App. Div.), *cert. denied*, 614 A.2d 617 (1992) (quoting in full *State v. Mancine*, 124 N.J. 232, 250-51, 590 A.2d 1107 (1991)).   As the Sixth Circuit has explained, under the federal version of the rule, the corroborating evidence need not prove the offense itself, but instead serves to ensure the reliability of the confession of the accused.   *See United States v. Brown*, 617 F.3d 857, 862 (6th Cir. 2010); *see also Smith*, 348 U.S. at 156.   Where the crime charged involved physical damage to a person or property, the corroborating evidence need only show that the crime to which the defendant confessed occurred.   *Brown*, 617 F.3d at 862 (citing *Wong Sun v. United States*, 371 U.S. 471,

489-90 n.15 (1963)).   It is clear, then, that under either the New Jersey rule or that established by the Supreme Court in *Smith*, the State need only provide corroborating evidence which would strengthen the reliability of the defendant's confession and establish that the crime in question did actually occur in order to meet the requirements of the corroboration rule.

In this case, Petitioner's confessions to the police were far from uncorroborated.   The State produced more than sufficient evidence to prove that the crime with which Petitioner was charged—that is, the robbery and murder of Petitioner's neighbors, did in fact occur.   Indeed, the physical evidence, although it did not tie Petitioner himself directly to the scene of the crime, showed that the robbery and murder in this case occurred in line with Petitioner's ultimate admission in so much as the victims were restrained and ultimately killed with knives from the victims' own home.   Likewise, the evidence in this case included the photographic evidence which showed Petitioner's mother's car being used by a man that Petitioner ultimately admitted was Petitioner himself driving to ATMs and using the victim's ATM card to withdraw money.   Likewise, based on Petitioner's statements to the police, the police were able to recover Petitioner's gun from his dryer.   Thus, there was more than sufficient evidence presented at trial to corroborate Petitioner's confession as the physical evidence of the brutal murder, the photographic/video evidence of Petitioner using his mother's car to withdraw money from his victim's bank account, and the recovery of Petitioner's firearm would all serve to strengthen Petitioner's confession, show that the underlying crimes did in fact occur, and in turn greatly increase the reliability of the confession used to prove Petitioner's guilt.   Petitioner's was not an uncorroborated confession, and any attempt to seek the dismissal of the charges or a judgment of acquittal on that basis would have been utterly without merit.   As such, counsel could not have

15

been ineffective in failing to challenge Petitioner's conviction in this manner.  *See United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) ("Counsel cannot be ineffective for failing to raise meritless claims . . . .").

Petitioner also raises the corroboration issue as a stand-alone claim in which he asserts that his conviction based on his own statement without sufficient corroboration is a violation of Due Process.   As a stand-alone claim, however, Petitioner has the additional problem that at least one court in this District has concluded that the corroboration rule is a judicially created doctrine without a constitutional basis, and therefore would not be cognizable as a habeas claim.  *See, e.g., Bennett v. Ricci*, No. 06-3583, 2007 WL 2444118, at *17 (D.N.J. Aug. 22, 2007) (Pisano, J.).   In any event, even if Petitioner's assertion was cognizable as a Due Process claim, Petitioner's confessions were more than sufficiently corroborated for the reasons expressed above.   As such, Petitioner's stand-alone corroboration claim fairs no better than his ineffective assistance of counsel claim, and Petitioner has failed to show that his conviction was a violation of Due Process in so much as his conviction was based chiefly on his confession.  *Smith*, 348 U.S. at 152-153; *Brown*, 617 F.3d at 862; *Abrams*, 607 A.2d at 185.

In support of his corroboration argument, Petitioner also attempts to assert that, regardless of any corroboration, his statements should also have been excluded because they were unreliable. In support of this contention, Petitioner asserts that his statements were unreliable both because they were the result of a lengthy interrogation process, and also because he was "threatened" with criminal charges which might be raised against his girlfriend and mother, potentially resulting in his children being placed into the hands of the state government.   Petitioner essentially argues that, despite the fact that he waived his *Miranda* rights, his statement should be considered

16

unreliable in so much as it was allegedly involuntary as a result of coercive police tactics.   While it is true that the Supreme Court has held that, under certain circumstances, police deception or threats may render a statement involuntary to the extent that the defendant's will was overborn by the coercive police activity, *see, e.g. Lynumn v. Illinois*, 372 U.S. 528 (1963) (misrepresentation by the police that a suspect would lose state aid for her children if she failed to cooperate rendered subsequent confession involuntary), the facts of Petitioner's case are entirely different from those cases.

As the Third Circuit has explained,

> The Due Process clauses of the Fifth and Fourteenth Amendment bar the use of incriminating statements that are involuntary.[]   *See generally* LaFave et al. 2 *Criminal Procedure* § 6.2(b), p. 444 (2d ed. West 1999).   The voluntariness standard is intended to ensure the reliability of incriminating statements and to deter improper police conduct, *id.* at pp. 444–45.   The ultimate issue of voluntariness is a legal question requiring an independent federal determination, *Miller v. Fenton*, 474 U.S. 104, 110[] (1985).   Thus, under the AEDPA habeas standard, we are required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent.
>
> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288[] (1991).   In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434[] (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226[] (1973)).   These surrounding circumstances include "not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167[] (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v.*

> *Williams*, 507 U.S. 680, 693[] (1993) (some internal citations
> omitted).

*Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002).

In this case, the totality of the circumstances clearly confirms that the state courts were correct in their conclusion that Petitioner's statement to the police was entirely voluntary. Although Petitioner was questioned for some twelve hours, that questioning took the form of several separate interviews with breaks for meals, use of the restroom, and the like in between. Likewise, the police, to make certain that Petitioner understood his rights, ensured that Petitioner was reread his rights and formally waived them a second time before the onset of the afternoon questioning by Holloman and later the detectives.   Petitioner, an adult with prior convictions who was surely familiar with the criminal justice system, has presented no real evidence to suggest that his will was in any way overborne.   To the extent that he asserts that his girlfriend, mother, and children were "threatened," Petitioner overstates the evidence in the record.   Detective Kolich's testimony during the *Miranda* hearing clearly indicates that Petitioner was told by the police that, if they were involved in his crimes, Petitioner's mother and wife would be subject to questioning and potential arrest.   Given the fact that Petitioner's girlfriend lived with Petitioner in the apartment above the victims and Petitioner's mother's car was used by Petitioner when he sought to withdraw money using the victim's ATM card, the police certainly had reason to believe that Petitioner's girlfriend and mother may have pertinent information, and may even have been involved.   As to Petitioner's children, the detective testified that, when asked by Petitioner what would happen if his girlfriend were arrested, Kolich told him it would be up to the courts what would happen to the children, a statement which certainly carries at least some truth to it.   There

18

is no evidence in the record that the officers ever threatened Petitioner's girlfriend, mother, or children, only that they informed Petitioner that his mother and girlfriend would be questioned, and answered questions regarding the fate of Petitioner's children if his family members were arrested.

Thus, Petitioner's case is factually distinguishable from cases such as *Lynum*. Given Petitioner's cooperation with the authorities, his choice to waive his *Miranda* rights, the frequent breaks he was given, and the lack of any credible evidence to support the conclusion that Petitioner's family was "threatened," the record does not support a conclusion that Petitioner's will was in any way overborn, nor a conclusion that Petitioner's statements to the police were in any way coerced or the result of improper police conduct. Having reviewed the record, then, it is clear that Petitioner's statements were not coerced, and Petitioner has shown neither that the circumstances of the interrogation required the suppression of his statements nor that his statements should be viewed as unreliable in light of the alleged police coercion. *Lam*, 304 F.3d at 264. As Petitioner has failed to show that his statements were involuntary, and because Petitioner's statements were corroborated, Petitioner has failed to show either that his conviction based on the evidence presented was improper or that he suffered ineffective assistance of counsel. Petitioner is thus not entitled to habeas relief based upon any of his corroboration claims.

**b.  Petitioner's adverse inference charge claims**

Petitioner also asserts that his trial counsel was ineffective for failing to request an adverse inference charge based on the officers involved in his statements allegedly destroying their notes after preparing their final reports. In so arguing, however, Petitioner cites to several cases, such

19

as *United States v. Ramos*, purportedly to show that police officers are required to retain their rough notes. 27 F.3d 65, 69 (3d Cir. 1994). Problematically for Petitioner, *Ramos* and the cases on which it relies govern the note retention requirement which applies in Federal Court. *Id.* Petitioner was not tried in federal court, and his entitlement to an adverse inference charge on the basis of the destruction of his notes would be governed by applicable state law and its retention requirements. Contrary to Petitioner's assertion that the police should have known to retain their notes, the state of New Jersey law on the subject at the time of Petitioner's trial was not so clear cut.

As the Appellate Division explained to Petitioner during the appeal of his PCR,

> [i]n *State v. W.B.*, 205 N.J. 588, 608-09 (2011), [the New Jersey] Supreme Court held that the pre-indictment destruction of police interview notes may entitle a defendant to an adverse inference charge. However, the Court deferred application of this new rule, providing that it would only have prospective effect beginning thirty days from the Court's opinion. [*Id.*]. Then, in *State v. Dabas*, 215 N.J. 114, 138 (2013), the Court reiterated that "the note-retention requirement would apply prospectively to pre-indictment cases beginning after the thirty-day grace period[,]" and did not retroactively apply to govern a preexisting case.

> Prior to *W.B.* [the New Jersey] Supreme Court indicated disapproval of the common police practice of destroying interview notes, but never found such destruction constituted a discovery violation. *See, e.g., State v. Cook*, 179 N.J. 533, 542 n. 3 (2004); *State v. Brach*, 182 N.J. 338, 367 n. 10 (2005). Court rules prohibited post-indictment destruction of interview notes. R. 3:13-3(b); *see Dabas*, [215 N.J. at 138.]

> Here, [Petitioner] alleges that police destroyed notes from his March 3, 2005 interview prior to his indictment. Even assuming his allegations are true, [Petitioner's] trial predated the new rule established in *W.B.*[] *W.B.* clearly lacks retroactive effect.[] Accordingly, [Petitioner's] allegations fail to establish that his trial counsel's performance was deficient.

20

(Document 38 attached to ECF No. 11 at 9-10).   As the Appellate Division explained, the rule

entitling a defendant to an adverse inference charge based on the destruction of notes did not apply

at the time of Petitioner's trial, and thus counsel could not have been ineffective in failing to request

a charge to which Petitioner was not entitled under state law at that time.   *United States v. Aldea*,

450 F. App'x 151, 152 (3d Cir. 2011).

Likewise, to the extent that Petitioner is asserting that the destruction of the notes would

have constituted a discovery violation under cases such as *Ramos*, Petitioner's claim is equally

meritless.   As the Third Circuit explained in *Ramos*, the destruction of notes, in the absence of

evidence of bad faith, would not constitute a *Brady* or other discovery violation unless the

Petitioner could show that there was exculpatory information contained in these notes.   *Ramos*,

27 F.3d at 69-72.   Even if, as Petitioner alleged, the officers did destroy notes in this case,[3] it is

clear from the state of the law at the time of the 2005 interview and Petitioner's trial, police in

New Jersey were under no requirement to retain their notes nor supply them to the defense.   Thus,

Petitioner's assertion that the police knew or should have known they were required to retain pre-

indictment notes is mistaken.   Although the New Jersey Supreme Court may have expressed

displeasure at the practice of destroying notes after preparing a final report, the police had not been

required to retain those notes until the New Jersey Supreme Court expressly imposed the

---

[3] Although Petitioner asserts that notes were destroyed, it is far from clear that this is the case. The testimony of agent Holloman directly contradicts the claim that he took or retained any notes other than Petitioner's biographical and descriptive details as explained in footnote one above. Likewise, Detective Toro testified that he could not recall any notes being taken during Petitioner's interview.   (Document 43 attached to ECF No. 11 at 3-12).   Thus, Petitioner has failed to even show that there were notes which were destroyed, let alone that any such notes were destroyed in bad faith.

requirement upon them in *W.B.*   Thus, there is no evidence that any bad faith was at play in this

matter, and Petitioner's conclusory allegations to the contrary are insufficient to show a discovery

violation.   *Id.*   As there is no evidence of a discovery violation, counsel could not have been

ineffective in failing to raise that issue in the trial court and Petitioner's ineffective assistance of

counsel claim must fail for that reason as well.   *Aldea*, 450 F. App'x at 152.   Likewise, because

Petitioner has not shown that the officers acted in bad faith, his attempt at a stand-alone claim

based on the destruction of notes is equally without merit.   *Ramos*, 27 F.3d at 69-72.

### 2.   Petitioner's "other crimes" evidence claim

In his final claim, Petitioner alleges that he was denied Due Process insomuch as one of

the police witnesses informed the jury that Petitioner had previously been to jail.   Petitioner

asserts that this testimony amounted to highly prejudicial, improper other crimes evidence and

required the declaration of a mistrial.   Specifically, Petitioner takes issue with the following

colloquy between the prosecutor and Detective Kolich discussing Petitioner's confession to Agent

Holloman:

> [Kolich]:   And then [Holloman asked Petitioner] why did you take
> a knife, [and Petitioner] said because I wanted to hide it, and
> [Holloman] said why did you want to hide it, and then [Petitioner]
> at that point explained that he had killed the little girl, Monica, [and]
> he had killed the father, Hossam.
>
> [The State]:   How did he explain it?
>
> [Kolich]:   He said he stabbed them.
>
> [The State]:   What was his tone of voice or his demeanor?
>
> [Kolich]:   Again, [Petitioner was] very calm.

> [The State]:   Did he say why?
>
> [Kolich]:   Yes, he did.
>
> [The State]:   Why?
>
> [Kolich]:   He said he didn't want to go back to jail, his wife had just
> had a baby, he did not want to go back to jail.

(Document 70 attached to ECF No. 11 at 27-28).

Following this colloquy, defense counsel called for a sidebar where he immediately moved

for a mistrial, arguing that the fact that Petitioner had said he didn't want to go to jail had never

before come up, such as in the *Miranda* hearing, that it was prejudicial in so much as it brought up

Petitioner's criminal history, and that counsel didn't believe a curative instruction would be

effective.   (*Id.* at 28-29).   In response, the prosecutor noted his shock and surprise, stated that he

had specifically told the officer not to mention it, and that he had expected a completely different

answer, presumably that Petitioner had killed them because one of the victims had seen him as

Petitioner had explained during his statements.   (*Id.* at 29).   The prosecutor thus argued that the

statement was an accident or mistake, and that a curative instruction would be more than sufficient

to address any resulting prejudice.   (*Id.*).   The trial court ruled as follows:

> I am going to deny your application for a mistrial.   A mistrial would
> only be granted if I'm totally convinced that there can be no way
> that a jury could otherwise be instructed to disregard it, and I am
> going to treat it that way, I'll instruct them.
>
> I am going to expand on the record later on because I do not
> want to keep the jury sitting here while we're over at sidebar, but I
> am going to tell the jury that they are to strike the previous answer,
> that they are not to consider it, that it is improper under our rules of
> evidence, that it is not part of this case, and that they are to strike it
> as though it had never occurred and it is to be no part of the case.

23

[After the parties argued as to whether the statement was admissible as it went to motive, a point on which the judge did not then rule, the trial judge then gave the following instruction to the jury]

Ladies and gentlemen, I'm going to instruct you to disregard the answer that this Detective gave to the last question.

Now, when I tell you to strike something from your mind, you have to strike it.   You've been here since the beginning of this, and we've gone over this time and time again, and you've sworn or affirmed that you will not have any thought or any discussion of this case at any time unless or until you're one of the 12 jurors that are going to be chosen at the end of the case, and when I tell you to strike something, when I tell you to strike an answer as though it didn't occur, that's based upon our laws of evidence that something is to be stricken from the record and stricken from your minds as though it did not occur, and that last answer  of the Detective is to be stricken and you are not to discuss it, it is not to have any bearing on the case, we're trying this case here now, and you're going to decide this case on the evidence in this case and the evidence alone.

From the day that this trial began through today, to the time that 12 of you, of the 16, are going to go in and decide the case, that is what you told me you would do and that's what . . . we accepted, and if anyone has any difficulty with following that or following my instructions, then you come and tell me during the break of this case over the lunch hour.

But you are to strike the last answer, it has no bearing on this case, and we're going to move on with this case and strike it.

(*Id.* at 31-32).  Following the close of the State's case, Petitioner moved for a new trial on the same basis, and the trial court denied that motion, finding that no juror had stated they were unable to follow the curative instruction, and the trial judge believed the curative instruction had been effective.  (*See* Document 96 attached to ECF No. 11 at 10-21).

Petitioner's claim, ultimately, is that the admission of the detective's testimony as to Petitioner's criminal history denied him due process because it improperly brought other crimes

evidence before the jury and thus made his trial unfair.   Generally, habeas relief will be warranted where the alleged error "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process."   *Cox v. Warren*, No. 11-7132, 2013 WL 6022520, at *11 (D.N.J. Nov. 13, 2013) (quoting in full *Moore v. Morton*, 255 F.3d 95, 105 (3d Cir. 2001)).   The Third Circuit dealt with a nearly identical claim as that presented here in *Minett v. Hendricks*, 135 F. App'x 547, 552-54 (3d Cir. 2005).   In denying that petitioner's claim, the Third Circuit noted that the Supreme Court has held that courts should "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant.'"   *Id.* at 553 (quoting in full *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).   The Third Circuit also noted that the Supreme Court has on several occasions refused to find that improperly admitted other crimes evidence fails to constitute a denial of due process where a limiting instruction has been provided, even where that limiting instruction is itself deficient.   *Id.*; *see also Estelle v. McGuire*, 502 U.S. 62 (1991); *Spencer v. Texas*, 385 U.S. 554 (1967).   The Third Circuit in *Minett* therefore rejected that petitioner's claim that the inadvertent admission of his other crimes evidence warranted habeas relief because he could not show that the state court's refusal to grant a mistrial amounted to a denial of Due Process.   *Minett* 135 F. App'x at 553-54.

Here, the state courts considered Petitioner's claim and concluded that, under state law, the curative instruction was more than sufficient to overcome any prejudice and the trial judge did not abuse his discretion in choosing to deny the mistrial.   (Document 21 attached to ECF No. 11 at 17).   Based on the facts in the record, there is no reason to doubt the applicability of the *Greer*

presumption to this case.   In this matter, the trial judge immediately responded to counsel's objection with a strongly worded limiting instruction that in no uncertain terms established that the jury was to disregard the detective's comment.   Likewise, the jury's verdict strongly supports the Appellate Division's conclusion that the detective's statement did not render Petitioner's trial fundamentally unfair in so much as the jury did not simply find Petitioner guilty of all charges, but parsed out each charge and found Petitioner guilty of some, but not all charges, and likewise found Petitioner guilty for certain charges as to some, but not all of the victims.   In light of their lengthy deliberations and the consideration clearly reflected in the jury's verdict, this Court cannot conclude that the jury was incapable of following the limiting instructions, nor that the fleeting comment regarding Petitioner having previously been in jail was devastating to the defense in this matter.   Thus, pursuant to *Greer*, this Court must presume that the jury followed the limiting instructions.   Given that presumption, the fleeting nature of the detective's comment, and the temporal proximity of the alleged error to the curative instruction, this Court cannot conclude that the detective's comment in and of itself was sufficient to render Petitioner's trial fundamentally unfair.   This Court thus finds that no Due Process violation occurred here.   Given that conclusion, and Petitioner's failure to otherwise identify any Supreme Court caselaw to which the state courts' decisions were contrary to or an unreasonable application of, Petitioner is clearly not entitled to habeas relief on this basis.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has

"made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 330 (2003). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Id.* at 327. For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree with this Court's conclusion that Petitioner's claims are without merit, and he has thus not shown that the issues presented deserve encouragement to proceed further. This Court shall therefore deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

IT IS SO ORDERED.

DATED:        June 28 2016

Hon. Jose L. Linares,
United States District Judge

27